IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

MITCH MICHINO,                          ) Civ. No. 13-00546 ACK-BMK
                                        )
            Plaintiff,                  )
                                        )
      v.                                )
                                        )
JOSHUA LEWIS, STEPHEN FLOWERS,          )
COUNTY OF HAWAII, COUNTY OF             )
HAWAII POLICE DEPARTMENT, DOES          )
1-20,                                   )
                                        )
            Defendants.                 )
_____ )


ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      For the following reasons, the Court hereby GRANTS

Defendants' Motion for Summary Judgment.

FACTUAL BACKGROUND[1/]

      This case arises out of a traffic stop that occurred in

Kailua-Kona, Hawaii on October 24, 2011. (Def's CSF, Ex. D

(Michino Depo.) at 28, 31.) Plaintiff is a practicing attorney

who lives in Malibu, California, but also owns a house in Kona

and visits approximately six times a year. (Id. at 7.)

      On the afternoon of October 24, 2011, Plaintiff was

hosting a rehearsal dinner for his son's wedding at his home in

Kona. (Id. at 28.) Plaintiff went out to pick up some food for

_____
      [1/] The facts as recited in this Order are for the purpose of
disposing of the instant motions and are not to be construed as
findings of fact that the parties may rely on in future
proceedings in this case.

the dinner at around 4:00 p.m. (Id.) Plaintiff admits he was in a rush. (Pl.'s CSF ¶ 6.) At approximately 4:20 p.m., Plaintiff was stopped by Officer Lewis of the Hawaii County Police Department for a seatbelt violation.[2/] (Def.'s CSF, Ex. D (Michino Depo.) at 31.) The stop occurred on Luhia Street near the intersection with Kaiwi Street, a location that Plaintiff described during his deposition as "probably one of the busiest stop sign place/intersections" in the area. (Id. at 115; Pl.'s CSF ¶ 9; Def.'s CSF, Ex. G (Lewis Decl.) ¶ 7.)

Officer Lewis states that, as he approached the driver's side window of Plaintiff's vehicle, Plaintiff began "yelling" and "demanded to know what I was doing stopping his vehicle." (Def.'s CSF, Ex. G (Lewis Decl.) ¶ 8.) Plaintiff told Officer Lewis that he was in a rush and late, and pleaded with Officer Lewis to let him go. (Pl.'s CSF ¶¶ 11-12; Def.'s CSF ¶¶ 11-12.) Officer Lewis requested Plaintiff's driver's license, registration, and proof of insurance; Plaintiff admits that he was unable to produce his registration or proof of insurance. (Def.'s CSF, Ex. D (Michino Depo.) at 46-46; Id., Ex. G (Lewis Decl.) ¶ 10; Pl.'s CSF ¶ 15.) Officer Lewis then informed Plaintiff that Plaintiff would receive a citation for driving

---

[2/] Plaintiff does not appear to dispute that he did not, in fact, have his seatbelt on at the time he was stopped. Plaintiff states that, prior to being stopped by Officer Lewis, he had unbuckled his seatbelt to remove his wallet from his pocket. (Id. at 39-40, 42.)

without his seatbelt and returned to his vehicle to write the ticket. (Pl.'s CSF ¶ 17; Def.'s CSF, Ex. G (Lewis Decl.) ¶ 11.) Officer Lewis states that Plaintiff became more upset when he learned he would receive a citation. (Def.'s CSF, Ex. G (Lewis Decl.) ¶ 11.) Officer Lewis states that he instructed Plaintiff to remain in his vehicle, (id.); however, Plaintiff disputes this, and states in his declaration that Officer Lewis never gave him any such instruction. (Pl.'s CSF, Ex. 2 (Michino Decl.) ¶ 15.)

Plaintiff apparently saw that Officer Lewis was using a computer in his police car, and believed that he "was doing more than . . . issuing a ticket," causing further delay. (Def.'s CSF, Ex. D (Michino Depo.) at 48-49.) Plaintiff therefore exited his car and walked up to the officer's car on the driver's side, intending to tell Officer Lewis to "hurry up." (Id. at 51, 59.) Officer Lewis states that Plaintiff appeared angry and was screaming and waving his hands. (Id., Ex. G (Lewis Decl.) ¶ 12.) Officer Lewis told Plaintiff to return to his vehicle. (Id.; Pl.'s CSF, Ex. 9 (Michino Depo.) at 45.) Officer Lewis states that Plaintiff shouted "You're a fucking asshole" several times, while Officer Lewis instructed him again to return to his vehicle.[3/] (Pl.'s CSF, Ex. G (Lewis Decl.) ¶ 12.) Plaintiff

---

[3/] Plaintiff's testimony regarding the instruction to return to his vehicle is somewhat inconsistant. In his deposition
(continued...)

eventually did return to his vehicle. (<u>Id.</u>) Plaintiff disputes that he called Officer Lewis a "fucking asshole" at any time prior to actually being handed the citation. (Pl.'s CSF, Ex. 9 (Michino Depo.) at 50.)

Officer Lewis continued writing the citation and, after some amount of time, Plaintiff again exited his vehicle. (Pl.'s CSF ¶ 28; Def.'s CSF ¶ 28.) Plaintiff states that he got out of his car the second time to tell Officer Lewis to hurry up because he thought Officer Lewis "had no reason to [be] spending that much of [sic] time to finish writing a seat belt violation ticket." (Def.'s CSF, Ex. D (Michino Depo.) at 51.) Officer Lewis states that Plaintiff continued to "yell and scream obscenities," refused instructions to get back into his vehicle, opened his tailgate and pointed to the trays of food, and then "began to clench both fists and started to approach" Officer Lewis. (Def.'s CSF, Ex. G (Lewis Decl.) ¶ 13.) Officer Lewis further states that Plaintiff refused his instruction to get back in his vehicle and called Lewis "a Gestapo and a cartel gang member." (<u>Id.</u>) Plaintiff admits he told Officer Lewis that he was "acting like

_____

[3]/(...continued)
testimony, he stated that Officer Lewis told him to return to his vehicle after he first approached the police car. (Pl.'s CSF, Ex. 9 (Michino Depo.) at 54.) In his declaration, however, Plaintiff asserts that Officer Lewis "did not direct me to stay in the car," and "did not say anything about arresting me any of the times that I approached him before he finished writing the ticket." (<u>Id.</u>, Ex. 2 (Michino Decl.) ¶ 15.)

the Gestapo." (Def.'s CSF, Ex. D (Michino Depo.) at 91-92.)

Officer Lewis states that he then informed Plaintiff that if he did not get back into his vehicle he would be arrested. (Def.'s CSF, Ex. G (Lewis Decl.) ¶ 13.) Plaintiff disputes that Lewis ever made such a warning. (Pl.'s CSF, Ex. 2 (Michino Decl.) ¶ 15.) Nevertheless, apparently Plaintiff returned to his vehicle. (Def.'s CSF, Ex. G (Lewis Decl.) ¶ 13; Pl.'s CSF ¶ 30 & Ex. 9 (Michino Depo.) at 47.)

By Officer Lewis's account, Plaintiff thereafter exited his vehicle a third time while pointing and waving. (Def.'s CSF, Ex. G (Lewis Decl.) ¶ 13.) Plaintiff testified at his deposition that he got out of his car "at least twice" and that he didn't remember whether he got out a third time because "more than twice becomes very - just too many, and it shows that I'm crazy or something." (Pl.'s CSF, Ex. 9 (Michino Depo.) at 47-48.) Officer Lewis states that he told Plaintiff to get back in his vehicle, but Plaintiff refused and walked toward Officer Lewis. (Def.'s CSF, Ex. G (Lewis Decl.) ¶ 13.) Officer Lewis states that, thereafter, he told Plaintiff he was under arrest, and to turn around and place his hands behind his back. (Id.) By Plaintiff's account, on the other hand, when Officer Lewis handed him the citation, he called Officer Lewis a "fucking asshole," after which Officer Lewis told Plaintiff that he was under arrest. (Pl.'s CSF, Ex. 2 (Michino Decl.) ¶ 17; Ex. 9 (Michino Depo.) at

5

199.)

Plaintiff states that he believed Officer Lewis was joking when he told Plaintiff he was under arrest and, therefore, Plaintiff began walking back to his vehicle. (Def.'s CSF, Ex. D (Michino Depo.) at 54; Ex. G (Lewis Decl.) ¶ 14; Pl.'s CSF ¶ 36.) Officer Lewis followed Plaintiff, instructing him to stop. (Pl.'s CSF ¶ 37; Def.'s CSF ¶ 37.) Officer Lewis states that Plaintiff got into his vehicle, then got back out again upon being instructed to do so by Officer Lewis. (Def.'s CSF, Ex. G (Lewis Decl.) ¶ 14.) Plaintiff disputes this account and apparently claims that he never reentered his vehicle.

Regardless, the parties agree that Officer Lewis then grabbed Plaintiff from behind, that Plaintiff stumbled but did not fall, and that Lewis then attempted to put handcuffs on Plaintiff. (Def.'s CSF ¶¶ 40-42; Pl.'s CSF ¶ 4; Def.'s CSF, Ex. D (Michino Depo.) at 58.) Officer Lewis states that, when he attempted to handcuff Plaintiff, Plaintiff tensed up and tried to pull away, at which point Lewis lost his grip and Plaintiff spun around to face Officer Lewis and went into a "fighting stance." (Def.'s CSF, Ex. G (Lewis Decl.) ¶ 14.) Officer Lewis then reached for his Taser, and Plaintiff, after observing this, said "if you are really arresting me, I'm not going to be resisting arrest," and allowed himself to be handcuffed. (Id.; Pl.'s CSF ¶¶ 44-45.) The parties agree that Officer Lewis did not forcefully

take Plaintiff down to the ground or use the Taser on him.
(Def.'s CSF ¶ 46; Pl.'s CSF ¶ 46.)

The parties dispute the amount of time that elapsed
between the initial traffic stop and Plaintiff's arrest:
Plaintiff claims the encounter lasted "fifteen, twenty minutes
and possibly more than thirty minutes," (Pl.'s CSF ¶ 48,) while
Officer Lewis states it took only eight minutes. (Def.'s CSF, Ex.
G (Lewis Decl.) ¶ 18.) The Background Event Chronology document
provided by Defendants shows Officer Lewis's radio call to
dispatch at approximately 4:23 p.m. reporting the traffic stop,
and a subsequent radio call at approximately 4:32 p.m. requesting
a transport vehicle, indicating the arrest had been made. (Def.'s
CSF, Ex. C.) Thus, it appears the duration of the stop was just
under ten minutes.

Plaintiff states that he was handcuffed and waiting on
the side of the road for transport to the police station for
between fifteen and thirty minutes. (Pl.'s CSF, Ex. 9 (Michino
Depo.) at 76.) He also states that the handcuffs were so tight
that they caused him pain and left marks on his wrists. (Id. at
91; Ex. 2 (Michino Decl.) ¶¶ 19-20.) Eventually, Officer Stephen
Flowers arrived to provide backup. (Id., Ex. 9 (Michino Depo.) at
77.) Plaintiff was transported to the police station in a marked
police vehicle, and was charged with obstructing government
operations in violation of Haw. Rev. Stat. § 710-1010, failure to

7

obey a police officer in violation of Haw. Rev. Stat. § 291C-23, resisting arrest in violation of Haw. Rev. Stat. § 710-1026, and driving without proof of motor vehicle insurance in violation of Haw. Rev. Stat. § 431:10C-104. (Def.'s CSF, Ex. G (Lewis Decl.) ¶ 15.)

Deputy Prosecutor Sheri Lawson reviewed the charges and filed a criminal complaint against Plaintiff. (Id., Ex. L (Lawson Decl.) ¶ 7; Ex. K (Criminal Complaint).) Plaintiff pled no contest to all of the charges except for the insurance charge, which was dismissed. (Id., Ex. L (Lawson Decl.) ¶ 7; Ex. E (Transcript of Proceedings).) As part of the acceptance of the no contest plea, Plaintiff was required to complete an anger management program and write a letter of apology to Officer Lewis. (Def.'s CSF, Ex. D (Michino Depo.) at 165; Ex. E at 60; Ex. L (Lawson Decl.) at ¶ 9.)

On November 3, 2011, Plaintiff filed a complaint with the Police Commission regarding Officer Lewis's behavior. (Pl.'s CSF, Ex. 3.) The Commission conducted a preliminary investigation and, on January 27, 2012, sent Plaintiff a letter stating that the Commission had found "sufficient evidence of misconduct with regards to Conduct Towards the Public" to refer Plaintiff's complaint to Police Chief Harry Kubojiri for review and

disposition.[4/] (<u>Id.</u>, Ex. 5.) Plaintiff states that he spoke to
Chief Kubojiri on two occasions about the incident, and that
Kubojiri told him that he couldn't "personally attend to the
issue," and that Plaintiff should file a complaint. (Pl.'s CSF,
Ex. 9 (Michino Depo.) at 120-126.) On April 2, 2012, Chief
Kubojiri sent Plaintiff a letter informing him that the Police
Department had completed its investigation into the misconduct
complaint, that the Administrative Review Board found there was
insufficient evidence to sustain charges of misconduct against
Officer Lewis, and that Chief Kubojiri concurred with those
findings. (<u>Id.</u>, Ex. 7.) The investigation was therefore closed.
(<u>Id.</u>) Apparently unsatisfied with the Chief's handling of the
incident, Plaintiff filed the instant suit.

## PROCEDURAL BACKGROUND

Plaintiff filed his Complaint on October 18, 2013,
asserting a number of claims under 42 U.S.C. § 1983 against
Officer Lewis, Officer Flowers, the County of Hawaii ("the
County"), and the Hawaii County Policy Department (the "Police
Department"). (Doc. No. 1.) Specifically, Plaintiff brought
claims for unlawful seizure and excessive force in violation of
the Fourth Amendment, violation of Plaintiff's First Amendment

---

[4/] With respect to "Conduct Towards the Public," the Hawaii
Police Department's rules require that officers be "courteous
when dealing with the public. They shall avoid harsh, violent,
profane, or insolent language." (<u>Id.</u>, Ex. 6.)

speech rights, and failure to train.[5] (Id.) On May 23, 2014, the parties stipulated to dismissal with prejudice of Plaintiff's claims against Officers Lewis and Flowers. (Doc. No. 10.) Thus, the only remaining defendants are the County and the Police Department (together, "Defendants").

On March 4, 2015, Defendants filed the instant Motion for Summary Judgment on All Claims, along with a concise statement of facts and numerous exhibits. (Doc. Nos. 30 & 31.) On May 26, 2015, Plaintiff filed his memorandum in opposition to the motion, supported by a concise statement of facts and exhibits.[6] (Doc. Nos. 37 & 38.) Defendants filed their reply on June 2, 2015. (Doc. No. 44.) A hearing on the motion was held on June 15, 2015.

---

[5] The Court notes that Plaintiff makes mention of "state law claims" in the portion of the Complaint addressing this Court's jurisdiction over the instant suit; however, nowhere in the Complaint does Plaintiff actually allege any claims based upon state law. (See Compl. ¶ 3.) During the hearing on the instant Motion, Plaintiff's counsel asserted that state law claims could nevertheless be implied by the Complaint; however, the Court disagrees. Nowhere in the Complaint, other than in a single paragraph addressing this Court's jurisdiction, does Plaintiff make any allegations regarding any state law claims. The Court therefore cannot construe the Complaint as bringing any state law claims.

[6] Because of the Memorial Day Holiday, Plaintiff's counsel erred in calculating the due date of the memorandum in opposition and, thus, filed it several days late. On May 26, 2015, however, the Court granted Plaintiff's Motion for Extension of Time to File Response, and permitted the late-filed opposition. (Doc. No. 40.) In so doing, the Court also granted Defendants a corresponding extension of time during which to file their reply. (Id.)

**STANDARD OF REVIEW**

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. Id. at 587. In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . . or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."

_Matsushita_, 475 U.S. at 585. "[T]he requirement is that there be no _genuine_ issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." _Anderson_, 477 U.S. at 247-48 (emphasis in original).

## DISCUSSION

As noted above, the only remaining defendants in the instant suit are the County and the Police Department.[7] Municipalities are legal "persons" subject to § 1983 liability under _Monell v. Dep't of Social Servs. of N.Y._, 436 U.S. 658, 690-91 (1978), but a municipality itself must inflict an injury to be liable. _Id._ at 694. Municipalities may be liable when their acts or omissions inflict constitutional injury and amount to official policy. _Clouthier v. County of Contra Costa_, 591 F.3d 1232, 1249 (9th Cir. 2010). Thus, a plaintiff wishing to bring federal civil rights claims against a local government "must establish that the local government had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation suffered." _A.E. ex rel v. Hernandez v. Cnty of Tulare_, 666 F.3d 631, 636 (9th Cir. 2012).

To establish municipality liability under _Monell_,

_____

[7] For purposes of municipal liability, a police department is part of its respective county. _Kriege v. Hara_, Civ. No. 11-00757 JMS, 2012 WL 1755671, at *8 (D. Haw. May 15, 2012) (citing _Headwaters Forest Def. v. County of Humboldt_, 276 F.3d 1125, 1127 (9th Cir. 2002)).

Plaintiff must prove: (1) that he was deprived of a federal constitutional or statutory right, (2) that the Defendants had a policy, (3) that this policy amounts to deliberate indifference to Plaintiff's constitutional rights, and (4) that the policy was the moving force behind the constitutional violation. <u>Dougherty v. City of Covina</u>, 654 F.3d 892, 900 (9th Cir. 2011). The Court therefore first addresses whether any constitutional violation occurred, and then turns to the issue of whether any such violation was perpetrated pursuant to a municipal policy or custom.

## I. Constitutional Violation

Plaintiff claims that Officer Lewis violated his Fourth and First Amendment rights. Specifically, Plaintiff asserts that Officer Lewis violated his Fourth Amendment rights by unlawfully arresting him and using excessive force, and violated his First Amendment rights by arresting him in retaliation for exercising his right to free speech. The Court addresses each alleged constitutional violation in turn.

### A. Fourth Amendment Unlawful Seizure

First, Plaintiff asserts that Officer Lewis violated his Fourth Amendment rights by arresting him without having probable cause to do so. (Opp'n at 7-8.) The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." <u>U.S. v. Place</u>, 462 U.S. 696, 700 (1983). A warrantless arrest is lawful under the Fourth Amendment "only if it is accompanied by probable cause to believe that the arrestee has committed, or is committing, an offense." <u>Torres v. City of L.A.</u>, 548 F.3d 1197, 1207 n.7. (9th Cir. 2008). Probable cause exists "if, 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'" <u>Beier v. City of Lewiston</u>, 354 F.3d 1058, 1065 (9th Cir. 2004) (quoting <u>Grant v. City of Long Beach</u>, 315 F.3d 1081, 1085 (9th Cir. 2002)). The Court must therefore decide whether a reasonable officer in Officer Lewis's position would have believed that there was probable cause to arrest Plaintiff. <u>See</u> <u>Fuller v. M.G. Jewlery</u>, 950 F.2d 1437, 1443 (9th Cir. 1991) ("[E]ven if the officers were mistaken that probable cause to arrest the Fullers existed, they are nonetheless immune from liability if their mistake was reasonable.").

Here, Plaintiff was charged with obstructing government operations in violation of Haw. Rev. Stat. § 710-1010, disobeying a police officer in violation of Haw. Rev. Stat. § 291C-23, resisting arrest in violation of Haw. Rev. Stat. § 710-1026, and driving without proof of insurance in violation of Haw. Rev. Stat. § 431:10C-104. The Court concludes as a matter of law that Officer Lewis had probable cause to arrest Plaintiff for at least

the first two of these offenses.[8/]

First, as is relevant here, under Hawaii law, a person
commits the misdemeanor offense of obstructing government
operations if, "by using or threatening to use violence, force,
or physical interference or obstacle, the person intentionally
obstructs, impairs, or hinders . . . the performance of a
governmental function by a public servant acting under color of
the public servant's official authority [or] the enforcement of
the penal law or the preservation of the peace by a law

_____

[8/] While it is undisputed that Plaintiff did not, in fact,
have proof of insurance at the time he was pulled over by Officer
Lewis, (see Def.'s CSF, Ex. D (Michino Depo.) at 45-46; Pl.'s CSF
¶ 15,) under Hawaii law, police generally may not arrest a
motorist for failing to have insurance, but must issue a citation
instead. See Haw. Rev. Stat. § 431:10C-117. As to the resisting
arrest charge, under Hawaii law, a person commits this offense if
he "intentionally prevents a law enforcement officer . . . from
effecting an arrest by . . . using or threatening to use physical
force against the law enforcement officer or another; or using
any other means creating a substantial risk of causing bodily
injury to the law enforcement officer or another." Haw. Rev.
Stat. § 710-1026. Generally such a charge requires a defendant to
forcibly resist arrest in a way that involves "some substantial
danger to the person. Mere non-submission ought not to be an
offense." Haw. Rev. Stat. § 710-1026, Commentary; see also State
v. Line, 214 P.3d 613, 620 (Haw. 2009). Here, while Officer Lewis
claims that, while he was trying to effect the arrest, Plaintiff
resisted his hold, turned around, and "went into a fighting
stance," Plaintiff disputes this account. (Def.'s CSF ¶ 43; Pl.'s
CSF ¶ 43.) Thus, there is at least a question of fact as to
whether Plaintiff actually threatened physical force against
Officer Lewis in order to interfere with the arrest. The Court
therefore cannot determine as a matter of law at this time
whether Officer Lewis could reasonably have believed Plaintiff
had committed the offense of resisting arrest here. Nevertheless,
as discussed below, because the Court believes Officer Lewis
clearly had probable cause for a number of other offenses, the
Court concludes that Plaintiff's arrest was not unconstitutional.

15

enforcement officer . . . ." Haw. Rev. Stat. § 710-1010. Here,
Plaintiff admits that he exited his vehicle and approached the
driver's side window of Officer Lewis's vehicle while the officer
was trying to process the citation at least twice, and possibly a
third time. (Pl.'s CSF ¶¶ 19, 25.) Thus, Plaintiff appeared to be
using his physical presence to intentionally hinder Officer
Lewis's issuance of the citation in performance of his role as a
law enforcement officer. Under these circumstances, the Court
concludes that Officer Lewis could reasonably have believed that
Plaintiff had committed the offense of obstructing government
operations.[9]

Moreover, Officer Lewis likewise had probable cause to
arrest Plaintiff for disobeying a police officer in violation of
Haw. Rev. Stat. § 291C-23. Under that provision, it is a petty
misdemeanor for any person to "wilfully fail or refuse to comply
with any lawful order or direction of any police officer invested
by law with authority to direct, control, or regulate traffic."
Id. Notwithstanding the fact that Plaintiff disputes Officer
Lewis's claim that he initially instructed Plaintiff to remain in

---

[9] The Court notes that Defendants appear to assert that
Plaintiff's plea of no contest to the criminal complaint filed
against him in state court is an admission of the factual basis
of the charges and, thus, sufficient to demonstrate probable
cause here. Under the Federal Rules of Evidence, however, pleas
of no contest are not admissible as against the defendant who
made them. See Fed. R. Evid. 410(a)(2). Thus, the no contest plea
cannot be used to establish facts in the instant suit to support
a finding of probable cause.

his vehicle while Officer Lewis wrote the citation, there is no dispute that Officer Lewis instructed Plaintiff to return to his vehicle after the first time Plaintiff approached Officer Lewis's vehicle to tell him to hurry up. (Pl.'s CSF ¶ 21.) Plaintiff returned to his vehicle after this instruction, but then almost immediately reemerged and approached Officer Lewis at least one more time, in direct contravention of Officer Lewis's instruction. (Pl.'s CSF ¶¶ 24-25.) Officer Lewis could therefore have had a reasonable belief that Plaintiff had committed the offense of disobeying a police officer in violation of Haw. Rev. Stat. § 291C-23.[10]

---

[10] The Court notes that Officer Lewis also likely had probable cause to arrest Plaintiff for a number of other crimes. A warrantless arrest is constitutional as long as probable cause existed for any crime, regardless of whether it is the crime ultimately charged. See Devenpeck v. Alford, 543 U.S. 146, 153 (2004) ("An officer's" subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.") Thus, for example, Officer Lewis could have had a reasonable belief that Plaintiff had committed the crime of disorderly conduct under Haw. Rev. Stat. § 711-1101. A person commits the offense of disorderly conduct if, "with the intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof," that person "engages in fighting or threatening, or in violent or tumultuous behavior," or "makes unreasonable noise," or "subjects another person to offensively coarse behavior or abusive language which is likely to provoke a violent response . . . ." Id. Here, Plaintiff repeatedly ignored Officer Lewis's requests that he return to his vehicle, approached the officer's vehicle several times, and called Officer Lewis "a fucking asshole." (Pl.'s CSF ¶¶ 19, 21, 25, 31, 33.) Moreover, Plaintiff has admitted that the incident occurred at a busy intersection; thus, Plaintiff's actions could easily have caused "physical inconvenience or alarm" to members of the public. (See Def.'s CSF, Ex. D (Michino
(continued...)

17

In sum, because the Court finds that Officer Lewis had probable cause to arrest Plaintiff under the facts presented here,[11/] the Court concludes that Plaintiff's arrest comported with the requirements of the Fourth Amendment.

## B. Fourth Amendment Excessive Force

Plaintiff also asserts his Fourth Amendment rights were violated when Officer Lewis used excessive force during the arrest. The Fourth Amendment, which protects against excessive force in the course of a seizure, requires that courts examine the objective reasonableness of a particular use of force to determine whether it was indeed excessive. Graham v. Connor, 490 U.S. 386 394–95, 398 (1989); see also Maxwell v. Cnty. of San Diego, 697 F.3d 941, 951 (9th Cir. 2012). To assess objective reasonableness, courts weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (citation and internal quotation marks omitted). Stated another way, the Court must "balance the amount of force

_____

[10/](...continued)
Depo.) at 115.) Thus, an officer in Lewis's position could reasonably have believed that Plaintiff had committed the offense of disorderly conduct.

[11/] The Court notes that this conclusion is bolstered by the fact that the prosecuting attorney, exercising her independent judgment, determined that there was sufficient evidence to warrant the filing of a criminal complaint against Plaintiff. (See Def.'s CSF, Exs. L & K.)

applied against the need for that force." <u>Meredith v. Erath</u>, 342
F.3d 1057, 1061 (9th Cir. 2003).

First, the Court must analyze the type and amount of
force that Officer Lewis used against Plaintiff during the
arrest. There is no dispute that Officer Lewis "grabbed Plaintiff
from behind," and leaned into Plaintiff, causing Plaintiff to
lose his balance, but not fall down. (Pl.'s CSF ¶¶ 39-42; Def.'s
CSF ¶¶ 40-41; Def.'s CSF, Ex. D (Michino Depo.) at 58.) There is
also no dispute that Officer Lewis did not forcefully take
Plaintiff down to the ground, and did not use any weapon on
Plaintiff. (Pl.'s CSF, ¶ 46; Def.'s CSF ¶ 46.) Plaintiff has not
presented any evidence that he suffered any physical injury or
required medical treatment as a result of Officer Lewis's
actions.[12/] (<u>See</u> Opp'n at 9; Pl.'s CSF generally.) As such, the
Court concludes that the nature and quality of the force used was
minimal.

Next, as to the governmental interests at stake, <u>Graham</u>
provides a non-exhaustive list of factors to consider, including

---

[12/] The Court notes that, in the Complaint, Plaintiff alleges
that he "wrenched his knee," and needed medical treatment for his
knee and one of his wrists, which suffered from the handcuffs
being too tight. (Compl. ¶¶ 26, 28-29, 39-40.) Plaintiff does
not, however, make mention of these alleged injuries in his
concise statement of facts in opposition to the instant Motion,
nor does Plaintiff present any evidence supporting these
allegations. Thus, for purposes of the instant Motion, it appears
Plaintiff is not asserting that he suffered any physical injury
because of the arrest.

"the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. Importantly, the <u>Graham</u> Court emphasized that the Supreme Court "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." <u>Id.</u> Officer Lewis was therefore constitutionally permitted to use some amount of reasonable force to effectuate Plaintiff's arrest.

Here, viewing the facts in the light most favorable to Plaintiff, the Court concludes that the physical force used on Plaintiff was objectively reasonable. Plaintiff admits that he believed Officer Lewis was joking and began walking away when he was told that he was under arrest. (Pl.'s CSF ¶ 36.) Thus, it is undisputed that Plaintiff did not initially comply with Officer Lewis's instructions upon being informed that he was under arrest. In response to this, Officer Lewis used minimal force: he grabbed Plaintiff from behind and leaned his weight into Plaintiff in an effort to handcuff him. (Pl.'s CSF ¶¶ 39-41.) It is undisputed that Officer Lewis did not forcibly cause Plaintiff to fall onto the ground, or use any weapon on Plaintiff. (Pl.'s CSF, ¶ 46; Def.'s CSF ¶ 46.) Thus, in light of the minimum force used on Plaintiff and the undisputed fact that Plaintiff did not

initially comply with Officer Lewis when he was told he was under arrest, the Court cannot conclude that Officer Lewis used unreasonable or excessive force in effectuating Plaintiff's arrest. See, e.g., Tatum v. City and Cnty of San Francisco, 441 F.3d 1090, 1096 (9th Cir. 2006) (finding the use of a "control hold to facilitate placing [the plaintiff] in handcuffs" was reasonable in light of the fact that the plaintiff resisted during the arrest). The Court therefore concludes that Plaintiff's Fourth Amendment rights were not violated by Officer Lewis's minimal use of force.

### C. First Amendment Violation

Finally, Plaintiff asserts that his First Amendment right to free speech was violated when Officer Lewis arrested him in retaliation for calling Officer Lewis "a fucking asshole." The First Amendment prohibits laws "abridging the freedom of speech, . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The First Amendment is applicable to the states and local governments through the Due Process Clause of the Fourteenth Amendment. Menotti v. City of Seattle, 409 F.3d 1113, 1140 n.51 (9th Cir. 2005) (citing De Jonge v. Oregon, 299 U.S. 353, 364 (1937)). A plaintiff can state a § 1983 claim for violation of his First Amendment rights by alleging that the defendant's conduct "deterred or chilled [the plaintiff's]

political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct." Id. at 1155. This standard requires only that the defendant "intended to interfere with [the plaintiff's] First Amendment rights"; actual deterrence is not required. Mendocino Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir. 1999) (citation and quotation marks omitted). "[T]he proper inquiry asks whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." Id. In addition, a plaintiff bringing a First Amendment retaliation claim must establish causation: the evidence must show that the officer's desire to chill the plaintiff's speech was "a but-for cause of [the officer's] allegedly unlawful conduct." Ford v. City of Yakima, 706 F.3d 1188, 1193 (9th Cir. 2013).

Plaintiff asserts that his arrest was made in retaliation for his calling Officer Lewis "a fucking asshole." (Opp'n at 9.) As rude and sophomoric as Plaintiff's speech to Officer Lewis may have been, "it represented an expression of disapproval toward a police officer" and, as such, "fell squarely within the protective umbrella of the First Amendment[.]" Duran v. City of Douglas, Ariz., 904 F.2d 1372, 1378 (9th Cir. 1990); see also City of Houston, Tex. v. Hill, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."). Moreover,

generally, courts have recognized that a retaliatory police action such as an arrest would chill a person of ordinary firmness from engaging in future First Amendment activity. <u>See, e.g.,</u> <u>Ford</u>, 706 F.3d at 1193-94 (citing cases).

Plaintiff has not, however, established causation. Specifically, Plaintiff has failed to produce any evidence suggesting that Plaintiff's speech (calling Officer Lewis "a fucking asshole") was a "but-for" cause of Officer Lewis's conduct in arresting Plaintiff. <u>See id.</u> As discussed above, Officer Lewis had probable cause to arrest Plaintiff for a number of offenses. While the existence of probable cause is not dispositive of Plaintiff's retaliation claim, it is nevertheless "highly probative" evidence of Officer Lewis's lack of retaliatory animus. <u>See</u> <u>Dietrich v. John Ascuaga's Nugget</u>, 548 F.3d 892, 901 (9th Cir. 2008). In light of the strong evidence suggesting that Officer Lewis had probable cause to arrest Plaintiff, and the complete dearth of evidence, other than Plaintiff's own self-serving assertion, to suggest that Plaintiff's speech was a but-for cause of his arrest, Plaintiff's First Amendment claim must fail.

In sum, the Court concludes that Plaintiff's claims that Officer Lewis violated his Fourth and First Amendment rights must fail as a matter of law. Because Plaintiff cannot show that Officer Lewis committed a constitutional violation, his <u>Monell</u>

claim against the County and the Police Department must likewise fail. See, e.g., Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir. 2001) ("Neither a municipality nor a supervisor, however, can be held liable under § 1983 where no injury or constitutional violation has occurred."). Nevertheless, the Court addresses the second prong of the Monell test below and finds, in the alternative, that Plaintiff's municipal liability claim fails on that basis as well.

## II.  Policy or Custom

Even assuming that a constitutional violation did occur, municipal liability under 42 U.S.C. § 1983 "can only be imposed for injuries inflicted pursuant to an official government policy or custom." Davis v. City of Ellensburg, 869 F.2d 1230, 1233 (9th Cir. 1989). A "policy" is a "deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Young v. City of Visalia, 687 F. Supp. 2d 1141, 1147 (E.D. Cal. 2009). "A 'custom' for purposes of municipal liability is a 'widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." Id.

"Absent a formal governmental policy, [Plaintiff] must show a 'longstanding practice or custom which constitutes the

standard operating procedure of the local government entity.'"
Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996). The policy or
custom "must be so persistent and widespread that it constitutes
a permanent and well settled city policy." Id. Liability for
improper policy or custom "may not be predicated on isolated or
sporadic incidents; it must be founded upon practices of
sufficient duration, frequency and consistency that the conduct
has become a traditional method of carrying out policy." Id.

Here, Plaintiff appears to be attempting to satisfy his
burden of showing such a policy or custom by relying on either a
"failure to train" theory, or a ratification theory. The Court
addresses each in turn.

A.    Failure to Train/Supervise

First, Plaintiff appears to assert that Hawaii County
Police Department officers (or, at least Officer Lewis) received
insufficient training or supervision regarding traffic stops,
arrests, and the use of force. (Opp'n at 11.) In order to succeed
under such a theory in the § 1983 context, Plaintiff's evidence
must address the following three factors:

> First, it must be determined whether the existing
> training program is adequate. The adequacy of a
> particular training program must be resolved "in
> relation to the tasks the particular officers must
> perform." A training program will be deemed
> adequate if it "enables officers to respond
> properly to the usual and recurring situations
> with which they must deal."

> Second, if the training program is deemed

inadequate, it may justifiably be said to constitute a city policy. Such will be the case, however, "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." This heightened degree of culpability on the party [sic] of a municipality may be established when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."

Finally, inadequate training that manifests deliberate indifference on the part of a municipality must be shown to have "actually caused" the constitutional deprivation at issue.

Merritt v. Cnty. of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 391-92 (1989)). Only if all three factors are proven can a municipality's training program be actionable under § 1983.

In light of the above standard, Plaintiff's § 1983 claims against Defendants predicated on a failure to train theory must fail. Plaintiff has raised no genuine issue of material fact that Defendants had actual or constructive notice that the Police Department's officer training was deficient. See Connick v. Thompson, 131 U.S. 1350, 1360 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."). Plaintiff states in his memorandum in opposition that Chief Kubojiri "specifically told [Plaintiff] that he knew there was a problem" and, thus, argues that this

amounted to deliberate indifference in his supervision and training of Officer Lewis. (Opp'n at 11.) Importantly, however, Plaintiff provides no factual evidence to support this assertion, other than his own self-serving declaration.[13] (See Pl.'s CSF, Ex. 2 (Michino Decl.) ¶¶ 11-12.)

In an attempt to support his failure to train theory, Plaintiff also points to statements he made in his own deposition about conversations he had with several acquaintances in the Kona area who allegedly told Plaintiff that Officer Lewis had a reputation for "treat[ing] people rough." (Id., Ex. 9 (Michino Depo.) at 127-133.) Even leaving aside concerns about the admissibility of such hearsay statements, Plaintiff's alleged conversations with these people simply do not demonstrate that Chief Kubojiri or anyone else in the Police Department was on notice of any alleged deficiencies in the training of police

_____

[13] Plaintiff's statement in his declaration appears to be somewhat inconsistent with his earlier deposition testimony. Plaintiff states in his declaration that, during his conversation with Kubojiri, he got "the distinct impression" that Kubojiri "knew that Officer Lewis was a problem . . . ." (Pl.'s CSF, Ex. 2 (Michino Decl.) ¶ 12.) He also states that Kubojiri "indicated"' that he was "aware that there was a problem." (Id. ¶ 11.) In his deposition testimony, however, even after being asked to recount exactly what was said during his conversations with Kubojiri, Plaintiff never stated that Kubojiri told him, or even indicated to him, that he was aware of a problem with Officer Lewis. (See id., Ex. (Michino Depo.) at 120-124.) Rather, Plaintiff stated that Kubojiri told him that he could not "personally attend [to] the issue" and that Plaintiff could file a complaint about the matter. (Id. at 122-23.)

officers.[14/]

Moreover, the Court has before it evidence that the Police Department does, in fact, provide training to its officers regarding traffic stops, arrests, and the use of force. Chief Kubojiri stated in his declaration that all Police Department officers undergo annual training, and are provided with a copy of the General Orders setting forth the policies and procedures of the Hawaii County Police Department. (Def.'s CSF, Ex. F (Kubojiri Decl.) ¶¶ 5-6.) The General Orders specifically prohibit excessive force and set forth the Department's arrest policy, which requires officers to abide by all laws and the U.S. Constitution. (Id. ¶¶ 7-8.) All complaints of excessive force are investigated by the Police Commission and the Administrative Review Board, which forwards its recommendation to Kubojiri for review. (Id. ¶¶ 9-10.) Plaintiff has introduced no evidence that these policies and procedures are insufficient, or that Defendants were on notice of such insufficiencies and nevertheless failed to remedy them. Municipal liability premised upon a failure to train or supervise therefore cannot attach as a matter of law. "Only where a failure to train reflects a deliberate or conscious choice by the municipality . . . can a

---

[14/] Moreover, even if Chief Kubojiri was aware of training deficiencies as to Officer Lewis, it is insufficient for purposes of Plaintiff's § 1983 claim to show only that a single officer was inadequately trained. See Canton, 489 U.S. at 390-91.

city be liable for such a failure under § 1983." <u>Canton</u>, 489 U.S. at 389; <u>see also</u> <u>Connick</u>, 131 U.S. at 1360. The Court therefore concludes that Plaintiff's § 1983 claim based on a failure to train or failure to supervise theory must fail.

**B.   Ratification**

Plaintiff also appears to assert that Defendants may be held liable under § 1983 based upon a theory that Officer Lewis's alleged wrongdoing was "ratified" by Chief Kubojiri. (Opp'n at 10-11.) First, even assuming that Kubojiri did "ratify" Officer Lewis's actions after the fact, Plaintiff cannot show that his ratification was the cause of the alleged constitutional violations. <u>See</u> <u>Williams v. Ellington</u>, 936 F.2d 881, 884-85 (6th Cir. 1991) (noting that <u>Monell</u> requires a causal connection between the municipal "policy" and the constitutional deprivation, and that a single instance of ratification after the fact was insufficient to constitute the "moving force" behind the alleged constitutional deprivation). As discussed above, Plaintiff has not produced any admissible evidence of any other unconstitutional traffic stops conducted by the Police Department, or other instances of Chief Kubojiri ratifying such conduct.

Moreover, Plaintiff has not demonstrated that Kubojiri did, in fact, ratify the allegedly unconstitutional conduct here. The Ninth Circuit has found municipal liability on the basis of

ratification when the officials involved "adopted and expressly approved of the acts of others who caused the constitutional violation." Trevino v. Gates, 99 F.3d 911, 920 (9th Cir. 1996). Here, to the extent Plaintiff is asserting that the result of the Administrative Review Board's investigation and the Police Department's failure to discipline Officer Lewis shows "ratification" by Chief Kubojiri, Plaintiff has failed to show "the decision was the product of a conscious, affirmative choice to ratify the conduct in question. Such a ratification 'could be tantamount to the announcement or confirmation of a policy for purposes of Monell.'" Edenfield v. Estate of Willets, Civ. No. 2006 WL 1041724, at *16 (D. Haw. Apr. 14, 2006) (citing Haugen v. Brosseau, 339 F.3d 857, 875 (9th Cir. 2003) (stating that municipal liability on a ratification theory requires that the policymaker approve a subordinate's decision and the basis for it, and that that approval is "tantamount to the announcement or confirmation of a policy"), reversed on other grounds by Brosseau v. Haugen, 543 U.S. 194 (2004) (per curiam); see also Tokuda v. Calio, Civ. No. 13-00202 DKW, 2014 WL 5580959, at *14 (D. Haw. Oct. 31, 2014) ("A mere failure to overrule the unconstitutional discretionary acts of subordinates, without expressly endorsing or approving of the conduct, is an insufficient predicate for the imposition of liability against the municipality." (internal quotes omitted)).

Plaintiff has simply failed to put forth any evidence suggesting that Chief Kubojiri and the Police Department have essentially adopted a policy of refusing to discipline officers (or Officer Lewis in particular) in the face of citizen complaints. Indeed, the evidence before the Court shows that Defendants did, in fact, investigate Plaintiff's complaint here: the Police Commission conducted an initial investigation and, upon making a preliminary finding that there was sufficient evidence of misconduct related to "Conduct Towards the Public," (a charge relating to the officer's failure to be courteous to the public, and not involving the use of excessive force) the Commission forwarded the complaint to the Police Department for further investigation. (Pl.'s CSF, Ex. 5.) The Police Department's Administrative Review Board then undertook its own investigation and ultimately determined that there was insufficient evidence to sustain any charges of misconduct. (Id., Ex. 8.) Officer Kubojiri concurred with the Administrative Review Board's findings. (Id.)

Plaintiff has introduced no evidence suggesting that these investigations were flawed, or their results a foregone conclusion. Indeed, the Court has before it no evidence that the single decision in this case not to discipline Officer Lewis rose to the level of a policy or custom of ratification of unconstitutional conduct. See Edenfield, 2006 WL 1041724 at *17

31

(stating that "something more than the failure to reprimand is needed to survive a motion for summary judgment," for example, evidence that it is "nearly impossible for an officer to be disciplined," or that "a unit is allowed to investigate itself" (citing <u>Santiago v. Fenton</u>, 891 F.2d 373, 382 (1st Cir. 1989) ("[W]e cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability."))); <u>Kanae v. Hodson</u>, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003) ("The law does not say that, whenever an investigative group accepts an officer's version over a victim's differing version, this acceptance establishes a policy for which a municipality may be held liable under § 1983."). The Court therefore concludes that Plaintiff's § 1983 claim based on a ratification theory must fail.

In sum, the Court concludes that Plaintiff's <u>Monell</u> claim against the County and the Police Department must fail as a matter of law because Plaintiff has failed to demonstrate that a constitutional violation occurred, or that any alleged constitutional violation was the result of a County custom or policy. Summary judgment is therefore appropriate in Defendants' favor.

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment.  Because the County and the Police

32

Department are the only remaining defendants in this action, no claims remain and this case may be closed.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 16, 2015



_____
Alan C. Kay
Senior United States District Judge

Michino v. County of Hawaii et al., Civ. No. 13-00546 ACK BMK, Order Granting Defendants' Motion for Summary Judgment.